Slip Op. 15-140

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| BOOMERANG TUBE LLC, et al., | |
| Plaintiffs, | |
| v. | Before: Timothy C. Stanceu, Judge |
| UNITED STATES, | Consol. Court No. 14-00196 |
| Defendant. | |
| and | |
| JUBAIL ENERGY SERVICES CO. and DUFERCO SA, | |
| Defendant-Intervenors. | |

## OPINION

[Denying relief in an action contesting a negative final determination in an antidumping duty investigation of certain oil country tubular goods from Saudi Arabia]

Date: December 17, 2015

*Paul W. Jameson*, Schagrin Associates, of Washington, DC, argued for plaintiffs Boomerang Tube LLC, TMK IPSCO, Energex Tube, and Welded Tube USA Inc.  With him on the brief was *Roger B. Schagrin*.

*Jeffrey D. Gerrish*, Skadden, Arps, Slate, Meagher & Flom LLP, of Washington, DC, argued for plaintiff United States Steel Corporation.  With him on the brief were *Robert E. Lighthizer* and *Luke A. Meisner*.

*Emma E. Bond*, Trial Attorney, Civil Division, U.S. Department of Justice, of Washington, DC, argued for defendant.  With her on the brief were *Benjamin C. Mizer*, Acting Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Claudia Burke*, Assistant Director.  Of counsel on the brief was *Shana A. Hofstetter*, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

*John M. Gurley*, Arent Fox LLP, of Washington, DC, argued for defendant-intervenors Jubail Energy Services Co. and Duferco SA.  With him on the brief were *Nancy A. Noonan* and *Diana Dimitriuc Quaia*.

Stanceu, Chief Judge: In this consolidated action,[1] several plaintiffs contest a negative "less-than-fair-value" ("LTFV") determination the International Trade Administration, U.S. Department of Commerce ("Commerce" or the "Department") issued to conclude an antidumping duty investigation of certain oil country tubular goods ("OCTG") from Saudi Arabia.  Commerce reached the negative determination, and terminated the investigation, based upon the *de minimis* dumping margin it calculated for the only investigated respondent, Jubail Energy Services Company ("JESCO"), defendant-intervenor in this action.

Before the court are two motions for judgment on the agency record made under USCIT Rule 56.2.  The court denies relief on these motions and affirms the contested determination.

## I. BACKGROUND

### A.  The Contested Determination

The determination contested in this consolidated action is *Amended Final Determination and Termination of the Investigation of Sales at Less Than Fair Value: Certain Oil Country Tubular Goods From Saudi Arabia*, 79 Fed. Reg. 49,051, 49,052 (Aug. 19, 2014) ("*Amended Final LTFV Determination*").[2]

---

[1] Consolidated under Consol. Court No. 14-00196, *Boomerang Tube LLC, et al. v. United States*, is *United States Steel Corporation v. United States*, Court No. 14-00201.  Order (Oct. 28, 2014), ECF No. 21.

[2] The "oil country tubular goods" ("OCTG") that were the subject of the investigation "are hollow steel products of circular cross-section, including oil well casing and tubing, of iron (other than cast iron) or steel (both carbon and alloy), whether seamless or welded, regardless of end finish (*e.g.*, whether or not plain end, threaded, or threaded and coupled) whether or not conforming to American Petroleum Institute (API) or non-API specifications, whether finished (including limited service OCTG products) or unfinished (including green tubes and limited (continued…)

### B.  The Parties to the Consolidated Action

Plaintiffs Boomerang Tube LLC, TMK IPSCO, Energex Tube, Welded Tube USA Inc. and United States Steel Corporation ("U.S. Steel") are U.S. producers of steel tube products that participated in the investigation as petitioners.  Compl. ¶¶ 3-4 (Aug. 26, 2014), ECF No. 6 (Court No. 14-00201) (U.S. Steel's complaint); Compl. ¶¶ 5-6 (Aug. 22, 2014), ECF No. 6 (remaining plaintiffs' complaint).  Defendant-intervenor JESCO is an OCTG producer in Saudi Arabia, and defendant-intervenor Duferco SA is an exporter of OCTG from Saudi Arabia.  Consent Mot. to Intervene as of Right 2 (Aug. 28, 2014), ECF No. 9.

### C.  The Motions for Judgment on the Agency Record

One of the two Rule 56.2 motions before the court is submitted by plaintiffs Boomerang Tube LLC, TMK IPSCO, Energex Tube, and Welded Tube USA Inc.  Mot. of Consol. Pls. Boomerang Tube, Energex Tube, a Division of JMC Steel Group, TMK IPSCO, and Welded Tube USA Inc. for J. on the Agency R. under Rule 56.2 and Br. in Support (Jan. 15, 2015), ECF No. 28 ("Pls.' Br.").  The second motion is by plaintiff U.S. Steel.  Mot. of Pl. United States Steel Corp. for J. on the Agency R. under Rule 56.2 and Mem. in Support (Jan. 15, 2015), ECF No. 30 ("U.S. Steel's Br.").

Opposing the Rule 56.2 motions are defendant United States and defendant-intervenors JESCO and Duferco SA.  Def.'s Response to Pls.' Rule 56.2 Mots. for J. on the Agency R. 6-7 (Mar. 30, 2014), ECF No. 38 ("Def.'s Opp'n"); Def.-intervenors' Jubail Energy Services

---

(. . . continued)
service OCTG products), whether or not thread protectors are attached."  *Amended Final Determination and Termination of the Investigation of Sales at Less Than Fair Value: Certain Oil Country Tubular Goods From Saudi Arabia*, 79 Fed. Reg. 49,051, 49,052 (Aug. 19, 2014) ("*Amended Final LTFV Determination*").

Company and Duferco SA's Response to Pls.' Mot. for J. on the Agency R. 6-8, (Mar. 30, 2015),
ECF No. 40 ("Def.-intervenors' Opp'n").

D.  Procedural History of the Less-than-Fair-Value Investigation and this Action

On July 29, 2013, Commerce initiated an investigation of sales at less than fair value of
certain OCTG from India, the Republic of Korea, the Republic of the Philippines, Saudi Arabia,
Taiwan, Thailand, the Republic of Turkey, Ukraine, and the Socialist Republic of Vietnam.
*Certain Oil Country Tubular Goods from India, the Republic of Korea, the Republic of the
Philippines, Saudi Arabia, Taiwan, Thailand, the Republic of Turkey, Ukraine, and the Socialist
Republic of Vietnam: Initiation of Antidumping Duty Investigations*, 78 Fed. Reg. 45,505, 45,506
(Int'l Trade Admin. July 29, 2013).  In investigating OCTG from Saudi Arabia, Commerce
selected Duferco SA, the largest known Saudi Arabian exporter of OCTG, as the sole mandatory
respondent.  *Antidumping Duty Investigation of Certain Oil Country Tubular Goods from the
Kingdom of Saudi Arabia: Respondent Selection* 3-4 (Aug. 29, 2013) (Admin.R.Doc. No. 51).
JESCO, an affiliate of Duferco SA, manufactured the OCTG that Duferco SA exported to the
United States from Saudi Arabia.  *Id.* at 1-2.

Treating Duferco SA and JESCO as a single entity for purposes of the investigation,
Commerce issued an affirmative preliminary less-than-fair-value determination on
February 25, 2014, determining a preliminary dumping margin of 2.92% for the combined entity.
*Certain Oil Country Tubular Goods From Saudi Arabia: Prelim. Determination of Sales at Less
Than Fair Value, and Postponement of Final Determination*, 79 Fed. Reg. 10,489, 10,490 (Int'l
Trade Admin. Feb. 25, 2014) ("*Prelim. LTFV Determination*"); *Issues & Decision Mem. for the
Prelim. Determination in the Antidumping Duty Investigation of Oil Country Tubular Goods
from Saudi Arabia*, A-517-804, at 2, 6-7 (Feb. 14, 2014) (Admin.R.Doc. No. 151), *available at*

http://enforcement.trade.gov/frn/summary/saudi-arabia/2014-04102-1.pdf (last visited

Dec. 14, 2015) ("*Prelim. Decision Mem.*").  Commerce also determined that Duferco

SA/JESCO's home market sales made to an affiliate were not at arm's length and should not be

used to calculate normal value.  *Prelim. Decision Mem.* at 7-8.  Determining that Duferco

SA/JESCO's remaining home market sales were made below cost, were therefore outside the

ordinary course of trade, and accordingly could not serve as the basis for determining normal

value, Commerce decided to determine normal value on the basis of constructed value ("CV").

*See id.* at 7-11.

Commerce published a final less-than-fair-value determination on July 18, 2014.  *Certain

Oil Country Tubular Goods From Saudi Arabia: Final Determination of Sales at Less Than Fair

Value*, 79 Fed. Reg. 41,986, 41,986 (Int'l Trade Admin. July 18, 2014) ("*Final LTFV

Determination*").  Commerce again calculated normal value on a CV basis and maintained its

decision to treat Duferco SA and JESCO as a single entity.  *See id*.  Commerce determined

constructed value profit according to profits realized by the Duferco SA/JESCO entity on certain

of the sales that this combined entity made to Colombia.  *See Issues & Decision Mem. for the

Final Affirmative Determination in the Less than Fair Value Investigation of Certain Oil

Country Tubular Goods from Saudi Arabia*, A-517-804, at 22-23 (July 10, 2014) (Admin.R.Doc.

No. 206), *available at* http://enforcement.trade.gov/frn/summary/saudi-arabia/2014-16867-1.pdf

(last visited Dec. 14, 2015) ("*Final Decision Mem.*").  Commerce determined a final margin of

2.69% for this entity.  *Final LTFV Determination*, 79 Fed. Reg. at 41,986.  Recalculating in

response to a ministerial error allegation submitted by JESCO and Duferco SA, Commerce

determined the *de minimis* margin, issued the negative amended final determination, and

terminated the investigation.  *Amended Final LTFV Determination*, 79 Fed. Reg. at 49,052.

These actions, now consolidated, followed.

## II. DISCUSSION

### A.  Jurisdiction and Standard of Review

The court exercises jurisdiction under section 201 of the Customs Courts Act of 1980,

28 U.S.C. § 1581(c) (2006), which grants this court jurisdiction over any civil action commenced

under section 516A of the Tariff Act of 1930 ("Tariff Act"), 19 U.S.C. § 1516a(a)(2)(B)(ii),[3]

including an action challenging the negative final determination of an antidumping investigation

issued by Commerce under section 735 of the Tariff Act, 19 U.S.C. § 1673d.  The court must

"hold unlawful any determination, finding, or conclusion found . . . to be unsupported by

substantial evidence on the record, or otherwise not in accordance with law."

19 U.S.C. § 1516a(b)(1)(B)(i).  Substantial evidence is "such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion."  *Consol. Edison Co. v. NLRB*,

305 U.S. 197, 229 (1938).

### A.  Plaintiffs' Claims and Responses of Defendant and Defendant-Intervenor

All plaintiffs claim that Commerce, in calculating normal value according to the CV

method, failed to determine constructed value profit according to a "reasonable method" as

required by 19 U.S.C. § 1677b(e)(2)(B)(iii).  *See* Pls.' Br. 7, 16; U.S. Steel's Br. 7-8.  They argue

that Commerce acted contrary to law in basing constructed value profit on the profit realized in

certain of the sales transactions between the combined Duferco SA/JESCO entity and an

affiliated distributor in Colombia.  In their view, Commerce erred in treating as actual "sales"

transactions occurring between the combined entity and the Colombian affiliate, which plaintiffs

---

[3] All statutory citations are to the 2012 edition of the United States Code.  All citations to regulations are to the 2012 edition of the Code of Federal Regulations.

argue should have been considered part of that combined entity.  Plaintiff U.S. Steel contends, in

addition, that the transactions in Colombia were made according to unusual circumstances and

that Commerce therefore erred in finding that they were made in the ordinary course of trade.

### B.  Plaintiffs Did Not Fail to Exhaust their Administrative Remedies

Defendant argues that plaintiffs are not entitled to relief on their claims because they

failed to exhaust their administrative remedies.  *See* Def.'s Opp'n 6, 15-18, 22-25 ("Plaintiffs

never argued to Commerce that that [*sic*] the Colombia sales were made outside of the ordinary

course of trade . . . .  Plaintiffs also failed to exhaust their current argument that JESCO's

Colombia sales are intra-company sales that cannot be used as the basis for the constructed value

profit.").  Defendant-intervenor argues, similarly, that "[a]s an initial matter, it is clear from the

record that Plaintiffs failed to exhaust their administrative remedies" with respect to the

argument that "JESCO's sales to its affiliated customer in Colombia through its affiliate, Duferco

S.A., qualify as intra-company transfers and cannot be used to calculate CV profit."  Def.-

intervenors' Opp'n 20.

Section 301 of the Customs Courts Act of 1980 provides that, in actions such as this one,

"the Court of International Trade shall, where appropriate, require the exhaustion of

administrative remedies."  28 U.S.C. § 2637(d) (2006).  The exhaustion requirement holds that

an interested party must raise all relevant arguments at the appropriate time in the proceeding.

*See Mittal Steel Point Lisas Ltd. v. United States*, 548 F.3d 1375, 1383-84 (Fed. Cir. 2008)

("Simple fairness to those who are engaged in the tasks of administration, and to litigants,

requires as a general rule that courts not topple over administrative decisions unless the

administrative body not only has erred but has erred *against objection made at the time*

*appropriate under its practice.*") (quoting *United States v. L.A. Tucker Truck Lines, Inc.*,

344 U.S. 33, 37 (1952) (emphasis in original)).

Courts have declined to apply the exhaustion requirement in situations where "the agency

change[s] its position . . . after [a] party's case brief [has been filed]." *Corus Staal BV v. United*

*States*, 502 F.3d 1370, 1381 (Fed. Cir. 2007) ("*Corus Staal*"); *see also Qingdao Taifa Group Co.*

*v. United States,* 33 CIT 1090, 1092–93, 637 F. Supp. 2d 1231, 1236–37 (2009) ("A

party . . . may seek judicial review of an issue that it did not raise in a case brief if Commerce did

not address the issue until its final decision, because in such a circumstance the party would not

have had a full and fair opportunity to raise the issue at the administrative level." (citing *LTV*

*Steel Co. v. United States*, 985 F. Supp. 95, 120 (CIT 1997))). The court has discretion in

deciding whether or not to apply the exhaustion doctrine. *See* 28 U.S.C. § 2637(d); *Corus Staal*,

502 F.3d at 1381 ("[A]pplying exhaustion principles in trade cases is subject to the discretion of

the judge of the Court of International Trade.").

In the Preliminary Determination, Commerce relied on the financial statements of a Saudi

Arabian producer, Saudi Steel Pipe Company, in calculating CV profit. *See Prelim. Decision*

*Mem.* at 11. Case briefs were due May 23, 2014, and rebuttal briefs were due May 30, 2014.

*See Prelim. LTFV Determination*, 79 Fed. Reg. at 10,490. It was not until the following July that

Commerce first indicated it might use Duferco SA/JESCO's sales to Colombia to calculate

CV profit, and this indication came when Commerce issued its final decision. *See Final*

*Decision Mem.* at 16-23; *Duferco SA – Final LTFV Determination Analysis Mem.* 6-7 (July 10,

2014) (Admin.R.Doc. No. 209). Defendant and defendant-intervenors argue, nevertheless, that

petitioners were on notice that Commerce might rely on Duferco SA/JESCO's sales to Colombia

to calculate CV profit because JESCO proposed in its case brief that Commerce use the

Colombia sales to determine CV profit.  Def.'s Opp'n 17, 23-24; Def.-intervenors' Opp'n 20-21.

Denying relief on exhaustion grounds would require the court to conclude that plaintiffs

should have predicted that Commerce might accept JESCO's proposal to use sales by

Duferco SA/JESCO to Colombia to calculate CV profit and should have raised, in their case

briefs, potential arguments against that possibility.  The court declines to require such

speculation.  The court concludes, instead, that petitioners did not have a full and fair opportunity

during the investigation to challenge the Department's method of determining CV profit.

Therefore, the court adjudicates on the merits the claims of all plaintiffs in this litigation.

C.  The Court Rejects Plaintiffs' Challenges to the Department's CV Profit Determination

Constructed value is calculated based on the sum of the cost of materials and fabrication

employed in producing the subject merchandise, plus amounts for selling, general, and

administrative expenses and for profit and U.S. packing costs.  Section 773(e) of the Tariff Act,

19 U.S.C. § 1677b(e).  In this litigation, plaintiffs challenge the method Commerce used to

calculate an amount for CV profit when determining the normal value of the subject merchandise

sold in the United States by Duferco SA/JESCO.

Because Commerce determined that the exporter made no home market sales in the

ordinary course of trade, Commerce could not use what it terms the "preferred method" of

calculating CV profit, which is provided in section 773(e)(2)(A) of the Tariff Act,[4] and instead

turned to the three alternatives set forth in section 773(e)(2)(B) of the Tariff Act, 19 U.S.C.

---

[4] Section 773(e)(2)(A) of the Tariff Act provides that constructed value profit is calculated using actual amounts "realized by the specific exporter or producer being examined in the investigation … for profits, in connection with the production and sale of a foreign like product, in the ordinary course of trade, for consumption in the foreign country …."  19 U.S.C. § 1677b(e)(2)(A).

§ 1677b(e)(2)(B)(i)-(iii).[5]  *See Prelim. Decision Mem.* at 10.  Commerce rejected the first

alternative, that of § 1677b(e)(2)(B)(i), because it found no record information permitting

calculation of profit realized by Duferco SA/JESCO on products in the "same general category"

as OCTG.  *Id.* at 11.  The second alternative, under § 1677b(e)(2)(B)(ii), was unavailable

because the combined Duferco SA/JESCO entity was the only respondent in the investigation.

*Id.*  Commerce proceeded to the method of § 1677b(e)(2)(B)(iii), under which Commerce may

determine CV profit based on "any other reasonable method," subject to an express limitation.[6]

---

[5] Section 773(e)(2)(B) of the Tariff Act provides:

[I]f actual data are not available with respect to the amounts described in subparagraph (A), then [constructed value shall be an amount equal to] –

(i)      the actual amounts incurred and realized by the specific exporter or producer being examined in the investigation or review for selling, general, and administrative expenses, and for profits, in connection with the production and sale, for consumption in the foreign country, of merchandise that is in the same general category of products as the subject merchandise,

(ii)     the weighted average of the actual amounts incurred and realized by exporters or producers that are subject to the investigation or review (other than the exporter or producer described in clause (i)) for selling, general, and administrative expenses, and for profits, in connection with the production and sale of a foreign like product, in the ordinary course of trade, for consumption in the foreign country, or

(iii)    the amounts incurred and realized for selling, general, and administrative expenses, and for profits, based on any other reasonable method, except that the amount allowed for profit may not exceed the amount normally realized by exporters or producers (other than the exporter or producer described in clause (i)) in connection with the sale, for consumption in the foreign country, of merchandise that is in the same general category of products as the subject merchandise [the "profit cap" limitation] ….

19 U.S.C. § 1677b(e)(2)(B).

[6] Constructed value profit determined under section 773(e)(2)(A)(iii) of the Tariff Act, § 1677b(e)(2)(B), is subject to the "profit cap" limitation of that provision.  In the investigation, Commerce concluded it lacked record information sufficient for calculation of a profit cap. *Issues & Decision Mem. for the Final Affirmative Determination in the Less than Fair Value* (continued…)

*Id.*  In the preliminary determination, Commerce chose to use financial data of another Saudi

pipe producer, Saudi Steel Pipe Company, to calculate CV profit.  *Id*.

    The record contained six potential sources of data from which to determine CV profit

under 19 U.S.C. § 1677b(e)(2)(B)(iii).  JESCO argued that Commerce should continue to use the

financial data of Saudi Steel Pipe Company, as Commerce had done in the *Preliminary LTFV*

*Determination*, or use the financial data of a different Saudi pipe producer known as "Arabian

Pipes."  *See Case Brief of Jubail Energy Services Company (JESCO) and Duferco SA* 50-68

(May 23, 2014) (Admin.R.Doc. No. 196); *Rebuttal Brief of Jubail Energy Services Company*

*(JESCO) and Duferco SA* 2-14 (May 30, 2014) (Admin.R.Doc. No. 199).  In the alternative,

JESCO argued that Commerce could use Duferco SA/JESCO's own sales or the subset of its

sales to Colombia.  *See JESCO Case Br.* 65-67.  Petitioners argued that Commerce should use

the financial data of either of two multinational pipe producers, Tenaris SA and Vallourec S.A.,

or the financial data of the U.S. OCTG industry as a whole.  *See Oil Country Tubular Goods*

*from Saudi Arabia: Petitioners' Case Brief* 1-4 (May 23, 2014) (Admin.R.Doc. No. 195); *Oil*

*Country Tubular Goods from Saudi Arabia: Petitioners' Rebuttal Brief* (May 30, 2014)

(Admin.R.Doc. No. 200).

    Choosing from among the various options, Commerce determined CV profit according to

the profit realized on certain sales that Duferco SA/JESCO made to a third-country market,

Colombia.  In choosing these sales as the basis for CV profit, Commerce reasoned that "[t]he

Colombian sales of JESCO are sales of OCTG products, a significant portion of which are

---

(. . . continued)
*Investigation of Certain Oil Country Tubular Goods from Saudi Arabia,* A-517-804, at 23
(July 10, 2014) (Admin.R.Doc. No. 206), available at
http://enforcement.trade.gov/frn/summary/saudi-arabia/2014-16867-1.pdf (last visited
Dec. 14, 2015) ("*Final Decision Mem.*").

identical to the products sold by JESCO in the home market and the United States, and the

related costs have been verified by the Department." *Final Decision Mem.* 22.  Commerce

further reasoned that "[t]hese sales meet all the requirements for CV profit set out under the

preferred method except for the fact that they were not sold in the foreign country," pointing out

that "[t]hey are sales of the foreign like product and were produced by the respondent in the

foreign country." *Id.*

As discussed previously, the Amended Final Determination reached a revised final

weighted-average dumping margin that was *de minimis*.  *See Amended Final LTFV*

*Determination*, 79 Fed. Reg. at 49,052; 19 U.S.C. §§ 1673d(a)(4), 1673b(b)(3) (requiring

Commerce to disregard as *de minimis* a weighted average dumping margin of less than 2 percent

ad valorem or the equivalent specific rate).  In calculating CV profit for the amended final

results, as it had when issuing the final results, Commerce narrowed its use of the Colombian

sales to those that were not made below cost.  *See Duferco SA – Amended Final LTVF*

*Determination Analysis Mem.* 3 (Aug. 11, 2014) (Admin.R.Doc. No. 235).

Plaintiffs assert two grounds upon which they claim that the Department's use of

JESCO's Colombia sales to calculate CV profit was not a "reasonable method" as required by

19 U.S.C. § 1677b(e)(2)(B)(iii).  The first argument, made by all plaintiffs, is based on an

assertion that all of the sales Commerce used in the amended final results to determine CV profit

were to the same buyer in Colombia, a distributor affiliated with Duferco SA/JESCO.  This

assertion is shown by the record to be correct.  *See Duferco SA – Amended Final LTVF*

*Determination Analysis Mem.* 3, Attachments 1-4, (Aug. 11, 2014) (Admin.R.Doc. No. 217)

(Non-Public); *Duferco SA – Final LTFV Determination Analysis Mem.* 7, Attachments 1-2 (July

10, 2014) (Admin.R.Doc. No. 207) (Non-Public).  All plaintiffs argue that these transactions

were not actual sales but instead were merely intra-company transfers, on the premise that

Commerce erred in failing to conclude that the affiliated distributor was part of the Duferco

SA/JESCO combined entity.  Pls.' Br. 16; U.S. Steel's Br. 9-11.  According to their argument,

the Department's erroneous assumption that these transactions are actual "sales" resulted in a

CV profit calculation that was not made according to a "reasonable method" as required by the

statute.  U.S. Steel adds that "Commerce's calculation of CV profit based on JESCO's sales of

OCTG to Colombia should also be overturned because it violated the statute's general preference

to avoid basing CV profit on sales that are made outside the ordinary course of trade," providing

various reasons why it believes these sales were made according to unusual circumstances.  U.S.

Steel's Br. 13.

### 1.  Commerce Was Not Required to Find that the Distributor in Colombia Was Part of the Duferco SA/JESCO "Combined Entity"

In its regulations, Commerce has provided itself authority to "collapse," i.e., treat as a

single entity, affiliated producers where two conditions are met.  The conditions are (1) "where

those producers have production facilities for similar or identical products that would not require

substantial retooling of either facility in order to restructure manufacturing priorities and"

(2) "the Secretary concludes that there is a significant potential for the manipulation of price or

production."  19 C.F.R. § 351.401(f)(1).  The regulation lists several factors the Secretary "may

consider."  *Id*. § 351.401(f)(2).[7]

---

[7] The regulation provides that:

(continued…)

After determining that JESCO and Duferco SA were "affiliated" within the meaning of

section 771(33)(E) of the Tariff Act, 19 U.S.C. § 1677(33)(E), Commerce applied § 351.401(f)

in treating these two companies as a single entity.  *Prelim. Decision Mem*. at 6-7.  Commerce did

not find that Duferco SA was a producer.  Instead, Commerce explained that "[w]hile 19 CFR

351.401(f) uses the term 'producers,' the Department's practice is to apply this regulation to

resellers and other affiliated companies as well."  *Id*. at 6 n.26.

Along with Duferco SA and JESCO, Commerce also "collapsed," into the entity to which

it referred as "the Duferco single entity," three other affiliated companies: Duferco Shipping,

Duferco Steel Inc., and Duferco Saudi Arabia.  *Id*. at 6-7.  Upon a finding that that these five

companies coordinated orders from customers, coordinated shipping and other logistics, and

supplied JESCO with inputs for the production of OCTG, Commerce further found, as to these

five companies, that "[e]ach Duferco company, therefore, is part of a chain of transactions

requiring extensive coordination of sales and production decisions (*e.g.*, price negotiations,

production planning, and shipping) and the sharing of sales information."  *Id*. at 7.  Commerce

did not conclude that the distributor in Colombia was within "the Duferco single entity."

To qualify for a remedy under the applicable standard of review, plaintiffs must show

that Commerce reached a determination that either was unsupported by substantial evidence on

---

(. . . continued)
In identifying a significant potential for the manipulation of price or production,
the factors the Secretary may consider include: (i) [t]he level of common
ownership; (ii) [t]he extent to which managerial employees or board members of
one firm sit on the board of directors of an affiliated firm; and (iii) [w]hether
operations are intertwined, such as through the sharing of sales information,
involvement in production and pricing decisions, the sharing of facilities or
employees, or significant transactions between the affiliated producers.

19 C.F.R. § 351.401(f)(2).

the record or otherwise was not in accordance with law.  On the former, plaintiffs do not

challenge any specific factual finding associated with the challenged determination as

unsupported by record evidence.  Their claim, instead, is essentially that Commerce acted

contrary to law in *not* finding that the Colombian distributor was part of the "Duferco single

entity" for purposes of 19 C.F.R. § 351.401(f) and accordingly in regarding the transactions

between Duferco SA/JESCO and the distributor as actual sales rather than intra-company

transfers.  Stated another way, their argument is that the record does not contain substantial

evidence to support the Department's *implicit* finding that the Colombian distributor was *not* part

of the single entity.  In reviewing this argument, the court must be guided by the statutory

standard of 19 U.S.C. § 1677b(e)(2)(B)(iii), i.e., the "reasonable method" standard.  Because

Congress has stated the standard in such a broad way, the court must accord Commerce a

significant degree of discretion.  The court also is guided by 19 C.F.R. § 351.401(f), the

regulation Commerce applied in "collapsing" some Duferco-affiliated entities but not the

Colombian distributor.

　　　　Under § 351.401(f)(1), Commerce is to decide whether "producers have production

facilities for similar or identical products that would not require substantial retooling of either

facility in order to restructure manufacturing priorities and the Secretary concludes that there is a

significant potential for the manipulation of price or production."  Here, there is no possibility of

manipulation of "production" because the entity at issue is a distributor, not a producer.  As

noted previously, Commerce interprets § 351.401(f)(1) to apply not only to producers but also to

affiliates that are not producers, an interpretation plaintiffs do not challenge here.  According to

the regulation, therefore, the relevant question is whether the Secretary was compelled by the

record evidence to find a "significant potential for the manipulation of price."  Plaintiffs do not

direct the court to evidence that would have compelled such a finding, and the court does not

find such evidence within the record.

Plaintiffs point to the fact that the Colombian distributor is an indirect subsidiary of

Duferco SA's parent company.  *See* Pls.' Br. 11-12; U.S. Steel's Br. 9-11.  But this affiliation

does not compel the conclusion that there was a significant potential for the manipulation of

price.  Plaintiffs also cite evidence that the Colombian entity purchases and distributes OCTG

that JESCO transferred to Duferco SA.  *See* Pls.' Br. 11-13; U.S. Steel's Br. 10-11.  From this

evidence, U.S. Steel argues that the Colombian entity "is involved in the production and sale of

OCTG." U.S. Steel's Br. 11.  However, plaintiffs point to no actual evidence demonstrating a

significant risk of manipulation of price.  Significantly, plaintiffs point to no evidence of

common managerial employees or board members or intertwined operations, such as the sharing

of sales information or other involvement in production and pricing decisions.  Plaintiffs have

failed to meet their burden of demonstrating that Commerce was compelled to treat the

JESCO/Duferco SA entity and its Colombian affiliate as a single entity under the regulation.

Moreover, other record evidence is contrary to a finding of a significant risk of price

manipulation.  Commerce found that the transactions it used to calculate CV profit, i.e., the not-

below-cost sales that were made to the Colombian distributor, were made at arm's length.

*Final Decision Mem.* 22-23.  For this finding, Commerce relied upon record evidence, consisting

of prices at which Duferco SA/JESCO sold OCTG to one or more unaffiliated customers in

Colombia, showing that the sales it used to calculate CV profit were made at prices comparable

to the market price of OCTG in Colombia.  *See Duferco SA – Final LTFV Determination*

*Analysis Mem.* 6-7.  A finding that a sale was made at arm's length may be supported by record

evidence that the sale price is comparable to the price at which the exporter or producer sold the

foreign like product to a party who is not affiliated with the seller.  *See* 19 C.F.R. § 351.403(c).

U.S. Steel cites record evidence showing common ownership between JESCO and the

Colombian distributor and the similarity of the Colombia transactions to U.S. transactions

between JESCO and the single Duferco entity.  U.S. Steel's Br. 10-11.  This evidence does not

establish a significant risk of price manipulation.  U.S. Steel also argues that "it is of no moment"

that the sales in Colombia used to determine CV profit "passed the arm's length test," on the

ground that "Commerce's well-established practice is to disregard intra-company transfers

between companies that are part of the same collapsed entity regardless of whether they pass any

of Commerce's tests for transactions between affiliated companies, including the arm's length

test."  *Id*. at 11 (citation omitted).  The court disagrees.  This argument *presumes* a Commerce

decision to collapse the entities in question, which did not occur here.  In any event, it is illogical

to consider a company's selling to an affiliate at arm's length prices to be irrelevant to a

"collapsing" analysis conducted under 19 U.S.C. § 351.401(f) that is directed to the question of a

significant risk of manipulation of price.

2.  The Department's Finding that JESCO's Sales to Colombia Were Made in the Ordinary
Course of Trade Is Supported by Substantial Record Evidence

U.S. Steel contends that "Commerce's calculation of CV profit based on JESCO's sales

of OCTG to Colombia should also be overturned because it violated the statute's general

preference to avoid basing CV profit on sales that are made outside the ordinary course of trade."

U.S. Steel's Br. 13.  According to U.S. Steel, "[a]s the Federal Circuit has recognized, where, as

here, home market sales are not available for use and CV profit must be calculated pursuant to

19 U.S.C. § 1677b(e)(2)(B), the statute continues to express 'a general preference' not to use

sales made outside the ordinary course of trade."  *Id*. (citing *Thai I-Mei Frozen Foods Co., Ltd.*

*v. United States*, 616 F.3d 1300, 1307 (Fed. Cir. 2010) ("*Thai I-Mei*")).  In making its argument,

U.S. Steel cites the statutory definition of "ordinary course of trade" provided in 19 U.S.C.

§ 1677(15)[8] and *CEMEX, S.A. v. United States*, 133 F.3d 897, 900 (Fed. Cir. 1998) ("*CEMEX*"),

for the proposition that Commerce must consider factors in addition to whether sales are below

cost in determining whether sales are in the ordinary course.  U.S. Steel's Br. 13.

        U.S. Steel's argument is unpersuasive.  Section 773(e)(2)(B)(iii) of the Tariff Act,

19 U.S.C. § 1677b(e)(2)(B)(iii), does not limit Commerce to the use of sales made in the

ordinary course of trade when determining CV profit.  To the contrary, the provision makes no

mention of sales in the ordinary course of trade and imparts significant discretion in allowing the

use of a "reasonable method."  U.S. Steel's citation to *Thai I-Mei* is unavailing, as the case does

not hold that Commerce's discretion is confined in the way U.S. Steel suggests.  Nor is the court

persuaded by U.S. Steel's citation of the statutory definition for "ordinary course of trade,"

which applies where the term is used in a statutory provision.  The reliance upon *CEMEX, S.A. v.

United States* is also misplaced.  That case arose from a claim by the foreign exporter that

Commerce had erred in ruling that home market sales of two of the three types of cement sold in

the home market were outside the ordinary course of trade within the meaning of 19 U.S.C.

---

[8] The statute defines "ordinary course of trade" as "the conditions and practices which, for a reasonable time prior to the exportation of the subject merchandise, have been normal in the trade under consideration with respect to merchandise of the same class or kind."  19 U.S.C. § 1677(15).  The provision directs Commerce to consider to be outside the ordinary course of trade sales made below the cost of production and sales between affiliated persons "if, in the case of any element of value required to be considered, the amount representing that element does not fairly reflect the amount usually reflected in sales of merchandise under consideration in the market under consideration."  19 U.S.C. § 1677b(f)(2); *see also* 19 U.S.C. § 1677(15) (citing 19 U.S.C. § 1677b(b)(1) and § 1677b(f)(2)); *see also* 19 C.F.R. § 351.102(b)(35) ("The Secretary may consider sales . . . to be outside the ordinary course of trade if the Secretary determines, based on an evaluation of all of the circumstances particular to the sales in question, that such sales or transactions have characteristics that are extraordinary for the market in question.").

§ 1677b(a)(1)(B)(i) and therefore not permitted to be used in determining the normal value of

subject merchandise sold in the United States.  *See CEMEX*, 133 F.3d at 899-900.

Commerce mentioned "ordinary course of trade" in reaching its decision to use the

Colombia sales, but the reference is only in the context of determining whether the sales were

below cost: "[i]n using these third country sales we consider it appropriate to perform a sales-

below cost test to ensure that they were made in the ordinary course of trade, consistent with the

preferred method." *Final Decision Mem.* 22-23 (footnote omitted)).  Commerce acted within its

discretion in deciding to exclude below-cost sales from its CV profit calculation.  Merely by

using the term "ordinary course of trade" in explaining its decision to do so, Commerce did not

narrow its own discretion on the question of whether those sales otherwise were suitable for use

in determining constructed value profit.  The question presented, therefore, is not whether the

sales Commerce used to determine CV profit were, in respects other than cost recovery, outside

the ordinary course of trade for purposes of the statutory definition, which does not apply to

19 U.S.C. § 1677b(e)(2)(B)(iii).  Instead, the question is whether the characteristics of those

sales otherwise made the sales unsuitable for use in determining CV profit according to the

"reasonable method" standard of 19 U.S.C. § 1677b(e)(2)(B)(iii).

U.S. Steel alleges that the Colombia sales Commerce used were made under "unusual

circumstances," pointing to record evidence concerning the circumstances under which the

merchandise on the sales was shipped to Colombia and reiterating its argument that the sales

were in fact intra-company transfers.  U.S. Steel's Br. 14.  U.S. Steel also contends that the sales

constituted an unrepresentative quantity of goods.  *Id*. at 15.  Third, U.S. Steel alleges that a

remand is required because Commerce erred in finding that a significant portion of the products

sold by JESCO in Colombia are identical to the products sold in the home market and the United

States, a finding U.S. Steel contends to be contradicted by record evidence.  *Id*. at 15-16.

Finally, U.S. Steel maintains that the profit rate of the sales is "inconsistent with other record

evidence showing that OCTG is one of the most profitable steel pipe products."  *Id*. at 16.  U.S.

Steel directs the court's attention to record evidence consisting of the financial statements of

Tenaris, a large multinational corporation that earned a profit of approximately 25% during the

POI, and "the weighted-average operating profit for the U.S. OCTG industry," which U.S. Steel

contends was 12.6% from 2010-2012.  *Id.* at 17.

 The record evidence U.S. Steel cites is not sufficient to support a conclusion that

Commerce acted contrary to law in using the Colombia sales to determine CV profit.  The

circumstances of shipping, the sales quantities, and the profit rate on the sales do not establish

that it was unreasonable for Commerce to use these sales for the limited purpose of determining

profit for the constructed value calculation.  In deciding to use these sales to determine CV

profit, Commerce compared the suitability of the data from these sales with other record

information that it might have used instead, acknowledging that it was "faced with several

imperfect options."  *Final Decision Mem.* 17.  Mentioning that the Colombia sales meet two of

the three requirements of the "preferred method," i.e., 19 U.S.C. § 1677b(e)(2)(A), Commerce

placed weight on the fact that these sales "are sales of the foreign like product and were

produced by the respondent in the foreign country," albeit products that were not sold *in* the

foreign country.  *Id*. at 22.  Moreover, Commerce found that the sales were at arm's length based

on record data from other sales of OCTG in the Colombian market, whereas U.S. Steel's

objections are grounded, in large part, on comparisons with markets other than Colombia.

 The court also rejects U.S. Steel's argument that a remand is required because of the

aforementioned finding as to identical merchandise.  The actual finding is stated in the Final

Decision Memorandum as follows: "[t]he Colombian sales of JESCO are sales of OCTG products, a significant portion of which are identical to the products sold by JESCO in the home market and the United States . . . ." *Final Decision Mem.* 22.  The Final Decision Memorandum pertained to the Final Results, not the Amended Final Results, the analysis memorandum for which set forth the final choice of Colombian sales for the CV profit calculation, i.e., the sales that were not made below cost.  *Duferco SA – Amended Final LTFV Determination Analysis Mem.* 3.  As defendant points out, Commerce did not reach a finding that the specific sales Commerce used to calculate CV profit were identical to the products JESCO sold in the home market or the United States.  Def.'s Opp'n 12.  U.S. Steel does not contest that the sales in question were of OCTG.

### III. CONCLUSION

For the reasons discussed above, plaintiffs are not entitled to relief on their claims.  The Department's finding that JESCO's sales to Colombia were actual sales rather than intra-company transfers was supported by substantial evidence on the record.  Plaintiffs' various arguments to the contrary, including U.S. Steel's arguments directed to the question of whether the sales used to determine CV profit were in the ordinary course of trade, do not demonstrate that Commerce failed to determine constructed value profit according to a "reasonable method" as required by law.  Pursuant to USCIT Rule 56.2, the court will enter judgment in favor of defendant United States.

/s/ Timothy C. Stanceu
Timothy C. Stanceu
Chief Judge

Dated:  December 17, 2015
          New York, New York